FILED

FEB -7 2018

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA



# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>INTERNATIONAL MANUFACTURING GROUP, INC.,<br><br>        Debtor.<br>_____<br><br>BEVERLY N. McFARLAND, Trustee,<br><br>        Plaintiff,<br><br>v.<br><br>BATTLE CREEK STATE BANK,<br><br>        Defendant.<br>_____ | Case No. 14-25820-D-11<br><br><br><br><br><br><br>Adv. Pro. No. 16-2082-D<br><br>Docket Control No. MBL-5<br><br><br><br>DATE:  January 31, 2018<br>TIME:  10:00 a.m.<br>DEPT:  D |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On November 20, 2017, defendant Battle Creek State Bank (the "Bank") filed a motion for summary judgment against the plaintiff, International Manufacturing Group, Inc., a liquidating debtor ("IMG"), by and through its plan administrator, The Beverly Group, Inc. (the "plan administrator"), pursuant to Fed. R. Civ. P. 56, made applicable in this proceeding by Fed. R. Bankr. P. 7056, or in the alternative, for summary adjudication of certain facts. The plan administrator filed opposition, the Bank filed a reply, and the court issued a tentative ruling in advance of the initial hearing. Pursuant to that ruling, the hearing was continued and the parties filed supplemental briefs on the issue of whether the alleged illegality of a particular

agreement necessarily means IMG did not receive reasonably equivalent value in exchange for the challenged transfers. For the following reasons, the court submits to the district court the following findings of fact and conclusions of law, pursuant to 28 U.S.C. § 157(c)(1), with the recommendation that the motion be granted.[1]

Summary judgment is appropriate when there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court discussed the standards for summary judgment in a trilogy of cases: <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986); and <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986). In a motion for summary judgment, the moving party bears the initial burden of persuasion in demonstrating that no issues of material fact exist. <u>Anderson</u>, 477 U.S. at 255. A genuine issue of material fact exists when the trier of fact could reasonably find for the non-moving party. <u>Id.</u> at 248. The court may consider pleadings, depositions, answers to interrogatories, and any affidavits. <u>Celotex</u> at 323. To demonstrate the presence or absence of a genuine dispute, a party must cite to specific

---

1. In June of 2016, the Bank moved to withdraw the reference of this adversary proceeding; the district court denied the motion without prejudice. The adversary proceeding is now much farther along, the parties do not dispute that the Bank is entitled to a jury trial, and resolution of this motion may well be dispositive of the adversary proceeding. For these reasons, and as the Bank has not consented to entry of final orders or judgment by this court, the court finds it appropriate to make a recommendation to the district court despite that court's suggestion that pre-trial motions might be resolved by this court.

materials in the record, or submit an affidavit or declaration by a competent witness based on personal knowledge. See Fed. R. Civ. P. 56(c)(1), (4). Where the movant bears the burden of persuasion as to the claim, it must point to evidence in the record that satisfies its claim. Anderson, 477 U.S. at 252. Once the moving party has met its initial burden, the non-moving party must show specific facts demonstrating the existence of genuine issues of fact for trial. Id. at 256.

By its complaint, the plan administrator seeks to avoid and recover, pursuant to California law, as permitted by § 544(b) of the Bankruptcy Code, certain pre-petition payments made by IMG to the Bank as actual and/or constructive fraudulent transfers. The Bank's motion is based on "good faith" and "for value" defenses. That is, as to the actual fraudulent transfer claims, the Bank contends it took the payments in good faith and for a reasonably equivalent value given to IMG, and therefore, that the payments are not avoidable. See Cal. Civ. Code § 3439.08(a). As to the constructive fraudulent transfer claims, the Bank contends its evidence demonstrates the plan administrator will be unable to make a prima facie case that the payments were made without IMG receiving a reasonably equivalent value for them, and therefore, that they are not avoidable. See Cal. Civ. Code § 3439.04(a)(2).

In September of 2008, five and a half years before IMG's bankruptcy case was filed, the Bank made a $1,200,000 loan to an individual named Larry Carter and an LLC of which he was the manager, N9FX, LLC ("N9FX"). The loan was secured by a security interest in an airplane owned by Carter or N9FX. Carter testifies in support of the motion that he and IMG's principal,

Deepal Wannakuwatte, agreed that Carter would loan IMG the $1,200,000 Carter was borrowing from the Bank and IMG would make the monthly payments on the airplane loan directly to the Bank. Wannakuwatte executed, as president and CEO of IMG, a promissory note for $1,200,000 in favor of Carter, which stated, "Monthly payments in the amount of $9,486.59 will be made to the airplane loan." Declaration of Larry Carter, DN 127, Ex. 3. That was the exact amount of the monthly payment Carter was to make on the Bank loan. The Bank's Loan Transaction History Summary Inquiry shows IMG made the payments regularly and on time and the plan administrator does not dispute that.[2]

As to both the actual and constructive fraudulent transfer claims, the Bank contends IMG received reasonably equivalent value for its monthly payments to the Bank because those payments reduced the amount due from IMG to Carter under the IMG/Carter promissory note. In other words, they were payments on an antecedent debt, which generally fall within the definition of "value" under California fraudulent transfer law. "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." Cal. Civ. Code § 3439.03. Although the antecedent debt owing by IMG was to someone – Larry

---

2. The Bank loan, by its terms, would have been all due and payable on September 2, 2013. In 2011, an individual named Jerry Nelson purchased Carter's sole member interest in N9FX (and therefore in the airplane), and the balance due on the Bank loan, $1,147,325, was paid off with the sale proceeds. See Declaration of Gerald C. "Jerry" Nelson, filed April 12, 2017, in connection with the motion designated DC No. BJ-1. By this adversary proceeding, the plan administrator seeks to avoid and recover the monthly payments IMG paid the Bank, a total of $246,650. As it was not made by IMG, the balloon payment is not in issue.

- 4 -

Carter – other than the recipient of the monthly payments – the Bank, the payments resulted in an indirect benefit to IMG in the form of the partial satisfaction of its debt to Carter – in amounts corresponding to the amounts of the monthly payments IMG made to the Bank.

"It is well settled that 'reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule.'" <u>Frontier Bank v. Brown (In re Northern Merch., Inc.)</u>, 371 F.3d 1056, 1058 (9th Cir. 2004) (citation omitted). Thus, for example, the shareholders of a company that already owed money to a bank signed a promissory note to the bank for a second loan, the proceeds of which were paid directly to the company which, in turn, granted the bank a security interest in its assets to secure the second loan. Later, when the company's bankruptcy trustee sought to avoid the security interest as a fraudulent transfer, the Ninth Circuit held:

> Although Debtor was not a party to the October loan, it clearly received a benefit from that loan. In fact, [the bank] deposited the $150,000 proceeds of the October Loan directly into Debtor's checking account. Because Debtor benefitted from the October Loan in the amount of $150,000, its grant of a security interest to [the bank] to secure Shareholder[s'] indebtedness on that loan, which totaled $150,000, resulted in no net loss to Debtor's estate nor the funds available to the unsecured creditors. To hold otherwise would result in an unintended $150,000 wind-fall to Debtor's estate. Accordingly, Debtor received reasonably equivalent value in exchange for the security interest it granted to [the bank].

<u>Id.</u> at 1059.

The plan administrator contends, however, that because IMG was actually the front for a sizeable Ponzi scheme, and because

the plan administrator claims to have established or to be able to establish that Carter was deeply involved in that scheme, the agreement between them - the IMG/Carter promissory note - was an illegal contract, and therefore, void and unenforceable as between Carter and IMG. Therefore, Carter could not have enforced the note as against IMG and when IMG made the monthly payments to the Bank pursuant to the note, IMG was not satisfying a valid antecedent debt owed to Carter. Accordingly, IMG received nothing of value in exchange, notwithstanding that IMG, not Carter, received the consideration for the payments - the $1.2 million proceeds of the Bank loan. The argument is based on the doctrine that the courts will not enforce an illegal contract.[3]

The plan administrator frames the issue as follows:

> Here, Battle Creek is attempting to retain the benefits of fraudulent transfers made by IMG in furtherance of its illegal enterprise and pursuant to a contract that is illegal under Ninth Circuit law [later citing Donell v. Kowell, 533 F.3d 762 (no pin cite) (9th Cir. 2008)]. The contract between IMG and Carter is the "groundwork" for Battle Creek's claim that the payments were made for reasonably equivalent value. Battle Creek elected to rely on the validity of whatever transaction existed between IMG and Carter when it accepted payments from IMG without evaluating the payor, without conducting any underwriting regarding the payor, and without examining the underlying transaction. Allowing Battle Creek to retain the payments made by IMG here effectively insulates the contract between IMG and Carter despite the disputed facts raised in the opposition as to

---

3. "It is well established that no recovery can be had by either party to a contract having for its object the violation of law. The courts refuse to aid either party, not out of regard for his adversary but because of public policy. Where it appears that a contract has for its object the violation of law, the court should sua sponte deny any relief to either party." Smith v. California Thorn Cordage, Inc., 129 Cal. App. 93, 99-100 (1933) (citation omitted).

> Carter's right to enforce the illegal contract or recover based on rescission. IMG received no genuine, legitimate, tangible value from paying money to Battle Creek. It only deepened the problems and losses to creditors from facilitating the Ponzi scheme.

Plan Administrator's Supplemental Memorandum, filed January 17, 2018, at 4:10-20. The court does not agree.

First, the determination of reasonably equivalent value "must be made as of the time of the transfer" (Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP), 408 B.R. 318, 341 (Bankr. N.D. Cal. 2009), citing BFP v. Resolution Trust Corp., 511 U.S. 531, 546 (1994)), whereas the plan administrator has not focused its analysis on the time period in which IMG made the monthly payments. In fact, most of the documents filed by the plan administrator as exhibits in support of its Ponzi scheme argument are dated after April of 2011, when the Bank loan was paid off in full.

Second, the plan administrator has cited no authority for the proposition that the doctrine of unenforceability of illegal contracts is or should be applied against one who was not a party to the illegal contract and who committed no wrongdoing himself.[4] In other words, the plan administrator has cited no case applying

---

4. As indicated above, the plan administrator has attempted to inject alleged wrongdoing on the part of the Bank into the analysis. As quoted above, the plan administrator maintains that "Battle Creek elected to rely on the validity of whatever transaction existed between IMG and Carter when it accepted payments from IMG without evaluating the payor, without conducting any underwriting regarding the payor, and without examining the underlying transaction." This argument is more appropriately considered on the issue of the Bank's good faith, discussed below. For present purposes, it is enough to say there was no wrongdoing on the part of the Bank in the formation or execution of the allegedly illegal contract – the IMG/Carter promissory note.

- 7 -

the doctrine of unenforceability of illegal contracts to defeat a "for value" defense to a fraudulent transfer action, and in fact, cases involving Ponzi schemes have rejected the plan administrator's position.

In Image Masters, Inc. v. Chase Home Fin., 489 B.R. 375 (E.D. Pa. 2013), the debtor, operating what turned out to be a $65 million Ponzi scheme, sold wrap-around mortgages to homeowners, who then made their total monthly mortgage payments to the debtor, who, in turn, contractually promised to make the monthly payments on the underlying first mortgages. When the scheme collapsed, the trustee sued the holders of the first mortgages to recover the monthly payments that had been made by the debtor on behalf of the homeowners. The bankruptcy court granted the mortgage holders' Rule 12(b)(6) motion, holding the trustee had failed to plausibly state a claim that the transfers were made without reasonably equivalent value to the debtor. In re Image Masters, Inc., 421 B.R. 164, 177-80 (Bankr. E.D. Pa. 2009).

The district court affirmed, holding that each monthly payment made by the debtor to a first mortgage holder resulted in a dollar-for-dollar reduction in the debtor's liability to the homeowner. Image Masters, Inc., 489 B.R. at 389. "Thus, there was no depletion to Image Masters' estate as a result of this transaction because the payment to the lender was matched by an equivalent reduction in Image Masters' obligation to the homeowner. From the perspective of estate preservation, the transaction was a wash." Id. at 390. The fact that the debtor was a Ponzi scheme did not change the analysis. Id. "The proper

focus of the reasonably equivalent value inquiry is the specific transaction sought to be avoided, not the transfer's collateral effects on the welfare of a debtor's business." Id. Finally, the court found that

> the practical implications of the Trustee's approach – that is, focusing on the overall effect on a debtor's business rather than the specific transaction – would render constructively fraudulent all transfers made by a Ponzi scheme debtor within the statutory time period. This does not comport with the relevant statutory language, nor the cases within this circuit, which intimate that transfers made by Ponzi scheme debtors may confer reasonably equivalent value.

Image Masters, Inc., 489 B.R. at 390.[5][6]

The trustee in Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.), 256 B.R. 664 (Bankr. S.D.N.Y. 2000), aff'd Balaber-Strauss v. Lawrence, 264 B.R. 303, 308

---

5.

Simply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance. If so, every vendor supplying goods to the debtor would receive an avoidable fraudulent transfer when the debtor paid the vendor's invoice. Every employee, even lower-level custodial and clerical employees, would be required to return their wages, regardless of the work they performed. Landlords would have to return rent payments, even if the debtor actually occupied the leased premises. No one conducting business with a debtor operating a Ponzi scheme could prevent the avoidance of payments they received from the debtor, regardless of the extent of the transferee's knowledge or culpability or the actual services provided. The law does not require this result.

Cuthill v. Greenmark, LLC (In re World Entm't, Inc.), 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002).

6. The Ninth Circuit has also held that transfers by Ponzi scheme debtors to their investors may confer reasonably equivalent value, in the form of satisfaction of the investors' restitution claims. See In re United Energy Corp., 944 F.2d 589, 595 (9th Cir. 1991).

- 9 -

(S.D.N.Y. 2001), made an argument very similar to the plan administrator's argument in the present case. She brought 61 adversary proceedings to avoid and recover commissions paid by the debtors to the brokers who originated mortgages and solicited investments in the debtors' businesses, which turned out to be a Ponzi scheme. The trustee did not assert the brokers had any knowledge of the Ponzi scheme or that they had themselves acted wrongfully in any way. Rather, she claimed the Ponzi scheme "was fueled and perpetuated by the Brokers' activities in soliciting investors. In providing a substantial portion of Churchill's actual revenues and in fostering the appearance of legitimate business operations, the Debtors' mortgage origination activities played an essential role in the Ponzi scheme." 256 B.R. at 667. Thus, the trustee's position was that the commissions paid by the debtors to the brokers, "although reasonably equivalent in value to the services provided in a marketplace sense, were constructively fraudulent simply because the commissions were paid by an entity engaged in a Ponzi scheme." Id. at 674.[7] The court phrased the issue this way:

> May the Brokers be held liable to repay commissions, which they earned in good faith and in fair exchange for services actually rendered, merely because the Debtors' management was independently engaged in a fraudulent enterprise? Stated differently, may the Brokers' services, as a matter of law, be deemed of no value to the Debtors because the Debtors' operation as a Ponzi scheme was facilitated or prolonged by the funds received by the Debtors through those services?

Id. at 675. The court's answer was no.

---

7. Although the trustee apparently did not use the term "illegal" contract, her argument was the same as the plan administrator's here.

- 10 -

1 The court concluded, "The statutes are quite clear. The
2 focus of the inquiry in both [state and federal law] is the
3 specific transaction the trustee seeks to avoid, i.e., the quid
4 pro quo exchange between the debtor and transferee, rather than
5 an analysis of the transaction's overall value to a debtor as it
6 relates to the welfare of the debtor's business."  256 B.R. at
7 678.  Emphasizing the purpose of the fraudulent transfer statutes
8 – "to preserve the assets of the estate" (id.), the court
9 concluded that "the analysis which must be used to determine
10 value is a commercial equation which looks to the actual
11 transaction between the debtor and the transferee, and the Court
12 must measure 'what was given and received' in that transaction."
13 Id. at 679.

14 The court cited Merrill v. Allen (In re Universal Clearing
15 House Company), 60 B.R. 985 (D. Utah 1986), in which the court
16 rejected the trustee's position that "because the [brokers']
17 services deepened the debtors' insolvency and furthered a
18 fraudulent [Ponzi] scheme, the services were 'without legally
19 cognizable value.'"  Churchill, 256 B.R. at 679, quoting
20 Universal Clearing House, 60 B.R. at 998.  The Universal Clearing
21 House court, as in Churchill, held that the reasonably equivalent
22 value analysis "should focus on the value of the goods and
23 services provided rather than on the impact that the goods and
24 services had on the bankrupt enterprise."  60 B.R. at 1000.
25 Thus, the court held the services of the debtors' sales agents
26 constituted value for the payments they received.  Id.

> The fatal legal flaw in [the trustee's position], as a
> matter of fraudulent conveyance analysis, is that it
> focuses not on a comparison of the values of the mutual

consideration actually exchanged in the transaction between the Broker and the Debtor, but on the value, or more accurately stated, the supposed significance or consequence of the Broker-Debtor transaction in the context of the Debtors' whole Ponzi scheme. But the statutes and case law do not call for the court to assess the impact of an alleged fraudulent transfer in a debtor's overall business. The statutes require an evaluation of the specific consideration exchanged by the debtor and the transferee in the specific transaction which the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law.

Churchill, 256 B.R. at 680. Thus, the Churchill court held:

> Fraudulent conveyance law is grounded in equity and is designed to enable a trustee or creditors to avoid a transfer in a transaction where the transferee received more from the debtor than the debtor received from the transferee. The remedy of avoidance seeks to rectify the disparity between that which the transferee gave and that which the transferee got in the transaction. It is this disparity that makes it equitable to require the transferee to repay the excess in value of what he received over what he gave up in the transaction. [¶] In this case there was no disparity between the commissions and the value of the Brokers' services. Equity, and the law, would be ill-served by granting relief on these complaints.

Churchill, 256 B.R. at 682.

In the present case, the Bank gave consideration, in the form of a $1.2 million loan, the proceeds of which were immediately received by IMG, and IMG gave consideration in the form of the monthly payments on the loan. Thus, as a matter of economic reality, and as a matter of the net worth of IMG's estate, IMG received reasonably equivalent value in exchange for the payments. The plan administrator has cited no authority for the proposition that the injection of Carter into the transaction as, in essence, an intermediary for the $1.2 million, should

change the outcome.[8] Further, viewing the IMG/Carter promissory note as an arguably illegal contract for the purpose of negating the value of the $1.2 million IMG received would not serve the policies underlying the illegal contract doctrine.

"The [doctrine] is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers;[fn] and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306 (1985). Here, the court is not resolving a dispute between two wrongdoers; in fact, as discussed below, the court finds the Bank has made a showing it acted in good faith and the plan administrator has not demonstrated there is a disputed issue of material fact on that point. Thus, the court, in granting the Bank's motion, would not be granting relief to an admitted wrongdoer. And granting this motion would not deter illegality in that neither party to the allegedly illegal agreement – neither Carter nor IMG, when they arranged for IMG to make the payments, considered the impact on the Bank as the possible

---

8. Under the plan administrator's theory, Carter's presence as a party to the IMG/Carter promissory note makes all the difference. That is, the plan administrator argues that if the note was an illegal contract, Carter would have had against IMG not only no breach of contract claim but also no claim for restitution. The Bank's exhibits reveal, however, that IMG knew in advance that Carter would be borrowing the $1.2 million and would then turn around and loan it to IMG. "Deepal, Here is the loan offer on the airplane and I think it looks as good as any other. . . . Shall I take the loan? Larry." Bank's Ex. 4. Arguably, the Bank, having been induced to make the loan to Carter by IMG's promise, through Carter, to make the monthly payments, would have had a direct claim against IMG for restitution if IMG had not made the payments. Thus, when IMG made the payments to the Bank, it was arguably reducing its own obligation to the Bank for restitution.

recipient of fraudulent transfers years after the monthly payments were made. Nor are parties to future contracts likely to consider such matters.

In short, the plan administrator's argument is a stretch too far. Application of the illegal contract doctrine would punish an innocent party for the alleged illegality of two other parties by depriving it of an otherwise valid "for value" defense as to the monthly payments IMG made on the $1.2 million it received. Concomitantly, applying the rule here would result in a windfall to the estate in that IMG received and retained the $1.2 million and the estate would also recover the monthly payments IMG made in exchange for the use of those monies. The court concludes the Bank has met its initial burden of persuasion in demonstrating that there are no triable issues of material fact as to whether IMG received reasonably equivalent value in exchange for the monthly payments it made to the Bank; that is, the Bank has made a showing sufficient for summary judgment IMG did receive such value. Despite the opportunity for further briefing, the plan administrator has not shown specific facts demonstrating the existence of genuine issues of fact for trial.

As for the good faith issue, the court finds the Bank has satisfied its initial burden of persuasion in demonstrating that no genuine issues of material fact exist. The person who has been the Bank's president since 1993 testifies the Bank knew nothing about IMG or Wannakuwatte at the time it made the loan; that the Bank does not unilaterally decide where to send account statements; that in this case, at Carter's request, the statements were addressed to N9FX and Carter and sent in care of

1　JTS Communities, Inc; that between October of 2008 and April of
2　2011, the Bank received the monthly payments and was paid off in
3　April of 2011; that at no time between those dates did the Bank
4　know of IMG's and Wannakuwatte's fraud, or have knowledge of any
5　facts that would suggest the payments the Bank was receiving from
6　IMG were made with the intent to defraud its creditors, or have
7　knowledge of any facts that would have suggested IMG was
8　insolvent at the time it made the payments, or receive any
9　information suggesting there was any suspicious activity on the
10　part of IMG. The Bank's president concludes: "There was nothing
11　unusual about the way Battle Creek received the payments on the
12　fully secured Loan with Carter. In my experience, there are
13　numerous situations where a payment from a third party is
14　entirely acceptable. Having received no calls from anyone, no
15　documentary evidence indicating that there was an issue, we did
16　not suspect that any issues existed as to the payments received
17　from IMG." Declaration of Roger Brestel, DN 128, ¶ 15.

18　　　　The plan administrator's only argument in opposition is that
19　the single fact that the loan payments were made by someone (IMG)
20　other than the Bank's obligor (Carter/N9FX) was enough of a red
21　flag to put the Bank on inquiry notice that something suspicious,
22　and possibly fraudulent, was going on. Thus, the plan
23　administrator states, "Battle Creek's files are devoid of any
24　information regarding why it was receiving payments on its note
25　from a third party not obligated on the debt" and

26　　　　　　the mere receipt by a financial institution of payments
　　　　　　　on a loan from a third party not obligated on the debt
27　　　　　　is a red flag warranting inquiry by the bank, since on
　　　　　　　its face, without any information or investigation into
28　　　　　　the basis for the third party to be making the

> payments, the payments appear to be gifts by the payor that would be subject to avoidance as fraudulent transfers unless (a) based on an investigation into the underlying relationship of the parties and transactions between them, the party making the payments is somehow receiving reasonable value in exchange for the transfers, or (b) an investigation into the financial status of the payor shows that entity, IMG, was fully solvent and could legitimately donate its assets for the benefit of Carter.

Plaintiff's Opp., DN 132, at 18:21-19:6.

The plan administrator has cited a single case for this proposition. In that case, <u>Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)</u>, 250 B.R. 776 (Bankr. S.D. Fla. 2000), the bank made a loan to a company it knew had no assets and it knew the company the money was actually going to was maxed out on its line of credit with and subject to borrowing restrictions by a group of other banks. The bank's senior vice president knew the real borrower's inability to incur additional debt was the only reason the "paper company" was used as the bank's nominal borrower. In other words, there was a lot more in the nature of red flags than a bank receiving payments from someone other than its named borrower.

In short, the court is not persuaded that the mere receipt of regular and timely monthly payments from someone other than a bank's borrower is, in and of itself, sufficient to put the bank on inquiry notice of something irregular going on with the payor. Further, the plan administrator has not suggested there are additional facts it might present showing there were any other red flags that should have put the Bank on inquiry notice.[9]

---

9. The discovery bar date and the deadline to disclose
(continued...)

Thus, in response to the Bank's prima facie case as to its good faith defense, the plan administrator has failed to show specific facts demonstrating that there are genuine issues of fact for trial.

For the reasons stated, the court submits these findings of fact and conclusions of law to the district court with the recommendation that the Bank's motion be granted and that judgment be entered in favor of the Bank and against the plan administrator.

Dated: February 07, 2018

*Robert S. Bardwil*
Robert S. Bardwil, Judge
United States Bankruptcy Court

---

9. (...continued)
experts have passed.